IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

TRAVIS L. ZABOKRTSKY,

    Defendant.

Case No. 5:19-cr-40089-HLT-1

**MEMORANDUM AND ORDER**

Defendant Travis L. Zabokrtsky, charged with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1), moves to suppress evidence seized during, and statements made in connection with, the July 9, 2019 traffic stop of a vehicle he was driving. Defendant argues law enforcement violated his rights by conducting a dog sniff within the curtilage of his home, unlawfully extending the scope of the traffic stop, and illegally searching his vehicle, warranting suppression of evidence seized during the stop. Doc. 21. Defendant also argues that his post-stop statements to law enforcement, though *Mirandized*, were rendered involuntary by earlier, un-warned custodial interrogations and therefore must be suppressed. Doc. 22. Because the Court ultimately finds that law enforcement did not violate Defendant's Fourth or Fifth Amendment rights, Defendant's motions to suppress are denied.[1]

---

[1] During the February 14, 2020 hearing on Defendant's motions to suppress, the Court heard testimony from three law enforcement members involved in the events related to the July 9, 2019 traffic stop: Officer Friedrichs, Officer Lauver, and Sergeant Hawks. Based on the demeanor and attentiveness of these individuals during questioning, the Court credits their testimony in its entirety. But the Court relays only those portions of the testimony relevant to its resolution of the motions.

I.  BACKGROUND

   A.  **The Initial Stop**

On July 9, 2019, Topeka Police Department ("TPD") Officer Evan Friedrichs observed a black Chevrolet Tahoe with a damaged front windshield at a gas station at the corner of SW 6th Avenue and SW Clay Street in Topeka, Kansas. Because the damage to the Tahoe's windshield—which included multiple cracks throughout and spidering in places—appeared to obstruct the driver's view, Officer Friedrichs decided to pull the vehicle over.[2]

The Tahoe left the gas station and, as it was driving eastbound on SW 3rd Street, Officer Friedrichs—who was following in a marked TPD patrol car—activated his patrol car's front- and rear-facing emergency lights. But, despite multiple open spaces along 3rd Street where the Tahoe could have pulled over, the driver did not stop, and, rather, continued driving east. As the Tahoe neared the intersection of 3rd Street and SW Taylor Street, the driver put his hand out the window of the vehicle, motioned to the south, and activated the vehicle's right blinker. Consistent with these signals, the Tahoe then turned right and headed south on Taylor Street. Officer Friedrichs activated his patrol car's siren and continued following the Tahoe. He noted another area where the vehicle could have pulled over at this point, but again the driver did not stop. The Tahoe then made another right turn into an alley and, as he followed the vehicle down the alley, Officer Friedrichs—using the patrol car's PA equipment—verbally commanded the driver to stop. The Tahoe continued driving down the alley and finally came to a stop after turning right into a gravel area adjacent to a residence located at 307 SW Taylor Street. Immediately to the west of the gravel area was a tall wooden fence with a sign indicating no trespassing. And immediately to the east

---

[2] Officer Friedrichs stopped Defendant on suspicion of violating K.S.A. § 8-1741(b), which provides in pertinent part that "[n]o person shall drive any motor vehicle with a damaged front windshield . . . which substantially obstructs the driver's clear view of the highway." Defendant does not challenge the validity of the initial stop. *See infra* Part II.A.

was a row of logs running perpendicular to the driveway and separating the alley from the front yard of the house.

After updating dispatch on his new location, Officer Friedrichs exited his patrol car and approached the Tahoe. Officer Friedrichs asked the driver "what took [him] so long" to pull over, to which the driver responded that he did not stop because he was "so close to right here" (apparently referencing the house). Officer Friedrichs then told the driver why he initiated the stop—the damaged windshield—and obtained identification from the driver, who was identified as Defendant, and a female passenger, identified as Season Gardner. There was also an infant child in a baby seat in the backseat of the Tahoe. During the exchange, Defendant informed Officer Friedrichs that he had a warrant for his arrest but that he believed it should have been recalled.

TPD Officer Qualls then arrived on the scene and worked with Ms. Gardner to ensure that the child was taken inside the house to be cared for by a family member. Officer Friedrichs, meanwhile, returned to his patrol car. While in the patrol car, Officer Friedrichs received information that Defendant was possibly involved in the sale of illegal narcotics and requested a K-9 officer to conduct a sniff of the Tahoe. Officer Friedrichs also ran searches to check the status of Defendant's driver's license and to see if either Defendant or Ms. Gardner had any active arrest warrants. After discovering that both Defendant and Ms. Gardner had warrants for their arrest—and confirming with TPD's records department that Defendant's warrant was indeed active—Officer Friedrichs took Defendant and Ms. Gardner into custody.

### B. The Dog Sniff

Subsequent to Defendant's arrest, TPD Officer Patrick Lauver arrived at the scene with his canine partner, Colt, to conduct a sniff of the Tahoe. Officer Lauver first walked around the Tahoe

to make sure there were not any hazards in or around the vehicle that would interfere with the sniff. During this check, Officer Lauver closed the open front passenger-side door. Officer Lauver and Colt then started the sniff at the rear bumper of the vehicle—with Officer Lauver commanding Colt to "find"—and worked around the Tahoe in a clockwise direction. During this initial pass, Officer Lauver noted that Colt came off the ground and sniffed an open window on the passenger side of the Tahoe. Once they had completed a full circle of the Tahoe, Officer Lauver guided Colt around the vehicle a second time—this time, in a counterclockwise direction. To begin the second rotation, Officer Lauver lightly touched the vehicle's right taillight with the back of his hand and again instructed Colt to "find." Officer Lauver testified that he touched the vehicle to keep Colt on task and also because he wanted Colt to restart his sniff from that point.

During the second rotation, while gesturing in an attempt to get Colt's attention and to focus him during the sniff, Officer Lauver also touched the front driver-side door seam. And, while at the front driver-side door, Colt stood on his hind legs, rested his front paws on the Tahoe, and began whipping his head back and forth and sniffing at the open window. Colt then sat down. Based on his training and experience with Colt, Officer Lauver understood this to be an indication that Colt had detected the odor of marijuana, cocaine, methamphetamine, or heroin. Officer Lauver informed the other officers at the scene that Colt had alerted and that the vehicle could be searched. Officers therefore searched the Tahoe. During that search, Officer Qualls found a firearm, which was ultimately discovered to have been reported stolen. But no narcotics were found.

After officers completed the search, at approximately 9:17 p.m., Officer Lauver approached Defendant—who was sitting in the back of Officer Friedrichs's patrol car in handcuffs—to ask whether he had used any methamphetamine that day or had any meth on him recently. Officer Lauver did not administer any *Miranda* warnings before this conversation.

Officer Lauver prefaced his questions by telling Defendant that the conversation was "completely besides the fact of the case," that Defendant was "not going to get anything charged to [him]" based on his answers, and that it was "a free conversation." Officer Lauver also told Defendant it was "just a traffic deal" and that he was not "catching anything extra from this." Officer Lauver explained that he wanted the information in order to confirm Colt's behavior; in other words, because the search had not revealed any drugs, Officer Lauver wanted to know if Colt had given a false indication, which is important for training. In response to the questions, Defendant stated that he had smoked meth earlier in the day.

### C. Interview With Sergeant Hawks

Officer Friedrichs ultimately transported Defendant to the TPD law enforcement center, where he was interviewed by Shawnee County Sheriff's Office ("SCSO") Sergeant Glenn Hawks. Sergeant Hawks is supervisor of the SCSO's narcotics unit and also serves as a task force officer with the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). The interview began at approximately 10:23 p.m.—about an hour after Defendant's conversation with Officer Lauver—and took place in an interview room. Defendant was not handcuffed during the interview and only Sergeant Hawks and Defendant were present. Sergeant Hawks was not aware of Defendant's conversation with Officer Lauver before conducting the interview.

Sergeant Hawks first identified himself as a law enforcement officer working for the SCSO and the ATF. Sergeant Hawks next explained why he was involved and what he had been told. At this point, Defendant asked Sergeant Hawks if there was anything he could do to help himself in the situation. Sergeant Hawks explained that it was possible and went through options, but told Defendant that he could not promise or guarantee him anything. Defendant repeatedly indicated he wanted to speak to law enforcement if it meant he could go home that night. Sergeant Hawks

again stated that he could not make any promises and told Defendant that, because he had a city warrant, he would likely (at a minimum) go to jail that night on that warrant.

Next, Sergeant Hawks collected Defendant's personal information. Sergeant Hawks then informed Defendant of his *Miranda* rights. He administered those rights verbally and also provided Defendant the written *Miranda* waiver form, going through the form with Defendant line-by-line. Defendant acknowledged his rights, signed the written waiver, and agreed to speak. Defendant told Sergeant Hawks that he graduated high school and could read, write, and understand English. In response to a question from Sergeant Hawks, Defendant stated that he had smoked meth and consumed a beer earlier in the day. But Defendant stated neither was affecting his understanding. During the interview, Defendant told Sergeant Hawks that the gun found in the Tahoe was his and, further, that he uses and distributes meth. He also indicated that he did not know the gun was stolen. Defendant was ultimately charged with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1).

## II. ANALYSIS

### A. Motion to Suppress Evidence (Doc. 21)

Defendant does not contest the validity of the initial stop.[3] Rather, Defendant rests his arguments for suppression on three aspects of the stop: the location of the stop, which he contends took place in the curtilage of the home; the extension of the stop to perform the dog sniff; and, finally, the physical contact by Officer Lauver—and his canine partner, Colt—with the vehicle during the course of the sniff.[4] Doc. 21. Because it ultimately bears on the Court's analysis of

---

[3] Although Defendant's motion to suppress indicated he may argue that Officer Friedrichs did not have reasonable suspicion for the initial stop (*see* Doc. 21 at 5 n.2), at the February 14, 2020 hearing Defendant made clear he is not challenging the basis for the stop.

[4] In his motion, Defendant also contends (in a footnote) that Officer Qualls conducted an illegal search of the Tahoe when he used his flashlight to look through the open driver-side window. Doc. 21 at 10 n.3. Arguments raised in a footnote are not properly before the Court. And Defendant did not raise this argument—or present any testimony

Defendant's other arguments, the Court first addresses Defendant's arguments related to the location of the stop.

### 1. Location of the Stop

In his motion, Defendant argues that the Court must suppress the evidence seized during the traffic stop because Officer Lauver conducted an illegal search by performing a dog sniff within the curtilage of his home without a warrant. Doc. 21 at 8-10. Defendant therefore asks the Court to make a finding that his driveway—where he parked the Tahoe and where the sniff took place—qualifies as curtilage, i.e., the area "immediately surrounding and associated with the home," which is afforded Fourth Amendment protection. *See Florida v. Jardines*, 569 U.S. 1, 6-7 (2013). If the driveway is curtilage, Defendant reasons, then the sniff—which Defendant concedes would not ordinarily constitute a Fourth Amendment search, *see United States v. Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011)—is rendered unlawful because it occurred in a constitutionally-protected area without a warrant.

But, ultimately, the Court need not decide whether the driveway is curtilage. Under the Fourth Amendment, although a law enforcement officer must generally obtain a warrant to enter a protected area, no warrant is required when a person <u>consents</u> to the officer's entry on that area. *See Payton v. New York*, 445 U.S. 573, 583 (1980). "[C]onsent to a search need not be express but may be fairly inferred from context." *Birchfield v. North Dakota*, 136 S.Ct. 2160, 2185 (2016).

Here, consent may be inferred because Defendant affirmatively led law enforcement to his driveway to conduct the stop. Under these circumstances, Defendant had no more Fourth

---

or evidence supporting this argument—during the February 14, 2020 hearing, which reinforces that Defendant did not consider this argument before the Court. Regardless, this argument is not meritorious, as the Supreme Court has held that "the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection." *Texas v. Brown*, 460 U.S. 730, 739-40 (1983) (holding that an officer's act of "shining his flashlight to illuminate the interior of [the defendant's] car" did not violate any Fourth Amendment right).

Amendment protections in his driveway than he would have had in any of the open spaces he passed on the public roadway. Upon initiating the stop, Officer Friedrichs issued repeated commands to Defendant—including lights, siren, and a verbal directive—to stop his vehicle in the public road. Although the evidence establishes there were multiple places where Defendant could have stopped, Defendant ignored Officer Friedrichs's commands and instead led him to Defendant's property, even motioning out of the Tahoe's window to indicate which direction he would turn. Defendant did not have a legal right to refuse to comply with Officer Friedrichs's attempt to conduct the traffic stop—yet he did so anyway. *See* K.S.A. § 8-1568(a)(1) ("Any driver of a motor vehicle who willfully fails or refuses to bring such driver's vehicle to a stop for a pursuing police vehicle . . . when given visual or audible signal to bring the vehicle to a stop, shall be guilty."). Defendant could not harbor any reasonable expectation that his driveway would remain free of police intrusion. And, because Defendant led officers to his driveway and consented to their presence there, those officers were entitled to proceed with the stop as if it were a standard roadside stop on a public street. Indeed, officers could have performed the dog sniff in a public place; by not pulling over, Defendant created the situation where the dog sniff was performed in his driveway. Officer Friedrichs even testified that he did not feel he had any choice regarding where Defendant's vehicle ended up—he had to follow it to that location.

The facts here bear substantial similarity to those presented in the Arizona Supreme Court's decision in *State v. Hernandez*, 417 P.3d 207 (Ariz. 2018). In *Hernandez*, officers initiated a traffic stop in a public road, but, rather than stopping, the driver of the subject vehicle drove onto the shoulder of the road, over a curb, and maneuvered onto a private driveway and into the backyard area of a residence. *Id.* at 208-09. The court held that, even though the officers' search occurred in a protected area, the officers did not impermissibly invade the defendant's reasonable expectation

8

of privacy because he impliedly consented to their entry on that area to complete the traffic stop. *Id.* at 211. The court stated:

> Although the driver's acquiescence to the stop, which is compelled by law, may not indicate consent to the stop itself, the driver's choice to lead the officers to a specific location for the stop constitutes the driver's implied consent to the officer's presence at that location. <u>Accordingly, police may reasonably assume that if a pursued driver, in acquiescence to a traffic stop, turns into a private driveway, the driver unequivocally communicates consent through his conduct in causing the stop's occurrence on the property</u>.

*Id.* (emphasis added). And, as the *Hernandez* court explained, allowing a driver to decline to stop on a public road and instead retreat onto private property—which provides a Fourth Amendment sanctuary from the law—would endanger officers and the public by incentivizing flight from law enforcement. *Id.* at 212-13. This is an untenable result.

In sum, the Court finds that Defendant impliedly consented to Officer Friedrichs conducting the stop in Defendant's driveway. Therefore, the fact that the dog sniff occurred in his driveway does not automatically render that sniff a constitutionally-impermissible search.

### 2. The Stop Did Not Violate the Fourth Amendment

The Court now turns to Defendant's other arguments for suppression, and, considering those arguments, concludes that the traffic stop and ensuing sniff did not violate the Fourth Amendment.

The Court first addresses Defendant's argument that law enforcement illegally extended the seizure of his vehicle during the stop in order to conduct the sniff. Doc. 21 at 6-8. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriquez v. United States*, 575 U.S. 348, 354 (2015). Because a dog sniff "[l]acks[s] the same close connection to roadway safety" as other inquiries considered part of the officer's

"mission"—such as checking a driver's license and registration, running searches for outstanding warrants, and issuing warnings or citations—"a dog sniff is not fairly characterized as part of the officer's traffic mission" and an officer may not "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id.* at 353, 355-56.

Defendant argues that all inquiries related to the "mission of the stop" were completed by the time Officer Lauver and his dog arrived to conduct the sniff, and, further, that prolonged seizure was not supported by reasonable suspicion that there were illegal narcotics in the vehicle. Doc. 21 at 6-8. In response, the government does not contend that Officer Friedrichs was still completing tasks related to the stop or that the radio call to Officer Friedrichs was sufficient to give rise to reasonable suspicion that there were drugs present. Rather, the government argues that extension of the stop to conduct the sniff was not unlawful because Defendant was already under arrest. Doc. 23 at 11-13. As the Tenth Circuit held in *United States v. Hunnicutt*, 135 F.3d 1345 (10th Cir. 1998), "detention of the driver at the scene to accomplish a canine sniff is generally reasonable where the driver is already under lawful arrest." *Id.* at 1350. Here, after Officer Friedrichs conducted the routine searches associated with the stop, an arrest warrant was confirmed for Defendant. Defendant was thus placed under arrest and was in custody when Officer Lauver and Colt performed the sniff. And, because Defendant was under lawful arrest at this time, his detention at the scene to conduct the sniff was reasonable and law enforcement did not unlawfully extend the stop.[5]

---

[5] The Court also notes that all occupants of the vehicle were under arrest and there was no one to drive the Tahoe away from the scene of the stop. Therefore, the Court reiterates that if the stop had occurred on the side of the public road—rather than in Defendant's driveway—the officers could have walked the dog around the Tahoe until someone came to collect the vehicle. Again, Defendant chose to lead law enforcement to his property to conduct the stop. For the same reasons discussed in Part II.A.1, *supra*, and taking into consideration similar policy concerns, allowing someone to drive to their property to avoid a dog sniff would be problematic in that it would provide motivation for a driver to not yield to law enforcement. A defendant should not be allowed to benefit—and claim constitutional protections he does not otherwise have—by disregarding lawful police commands.

The Court next addresses Defendant's argument that Officer Lauver conducted an illegal search when he (and Colt) trespassed on the Tahoe by physically touching the vehicle during the sniff. In support of this argument, Defendant relies heavily on the Fifth Circuit's decision in *United States v. Richmond*, 915 F.3d 352 (5th Cir. 2019). *See* Doc. 21 at 11-12. In *Richmond*, a law enforcement officer pushed his fingers against the defendant's car's tire during a traffic stop in an attempt to confirm his suspicion that the tire contained more than just air. 915 F.3d at 353. The officer was correct and found that the car's tire contained illegal drugs. *Id.* at 355. The Fifth Circuit—relying on the "trespass" test revived by the Supreme Court in *United States v. Jones*, 565 U.S. 400 (2012)—held that this brief physical examination of the tire qualified as a Fourth Amendment search. *Id.* at 356-58. Defendant equates the officer's "pushing" or "tapping" of the tire in *Richmond* with Officer Lauver's touching of the Tahoe here.

But, as the Fifth Circuit emphasized in reaching its decision in *Richmond*, "a trespass does not get a defendant all the way to characterizing police conduct as a search." *Id.* at 357. "Consistent with the meaning of 'search,' a trespass <u>must be conjoined with an attempt to find something or obtain information</u>." *Id.* (emphasis added) (internal quotations omitted). "This prevents a mere physical touching . . . from being a search." *Id*. Here, Officer Lauver's contact with Defendant's vehicle was incidental and, in one instance, unintentional. He did not touch the Tahoe in an attempt to find something or obtain information. Rather, he was simply attempting to keep his canine partner focused and on task during the course of the sniff. This mere touching—without any manipulation or effort to discover what was within—does not constitute an illegal search.[6]

---

[6] And, even if this holding is found to be in error, suppression is not the appropriate remedy here given the lack of deliberate conduct by Officer Lauver and the minimal intrusiveness of his incidental contact with the vehicle.

And, as to any argument by Defendant that the Fourth Amendment was implicated when Colt jumped up and placed his front paws against the body of the Tahoe, courts have held that a dog's "minimal and incidental contact" with the exterior of a car is not a search. *See United States v. Olivera-Mendez*, 484 F.3d 505, 511-12 (8th Cir. 2007) (where drug-sniffing dog jumped and placed his front paws on the body of the defendant's car during a walk-around sniff, holding that "[t]he sniff . . . was comparable to other canine alerts evaluated by the Supreme Court, and it did 'not rise to the level of a constitutionally cognizable infringement'"). Likewise, to the extent Colt's snout broke the plane of the open driver-side window during the course of the sniff, the Tenth Circuit has held under similar circumstances that such "instinctive actions" do not violate the Fourth Amendment. *See United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989) (holding that a dog's instinctive actions did not violate the Fourth Amendment where the dog jumped without encouragement into a vehicle through a door that the defendant left open).

For all of these reasons, the Court denies Defendant's motion to suppress the evidence seized during the July 9, 2019 traffic stop.

### B. Motion to Suppress Statements (Doc. 22)

The Court now turns to Defendant's motion to suppress statements made during his interview with Sergeant Hawks.[7] Defendant told Sergeant Hawks, subsequent to his conversation with Officer Lauver and while in an interview room at the TPD law enforcement center, that the gun found in the Tahoe was his (among other things). Sergeant Hawks administered Defendant his *Miranda* warnings before Defendant made those statements. But Defendant—relying on the

---

[7] At the hearing, the government represented that it did not intend to use the un-*Mirandized* statements made by Defendant to Officer Lauver during the July 9, 2019 traffic stop. In reliance upon this representation, Defendant therefore made clear that he is <u>not</u> seeking suppression of his statements to Officer Lauver. Rather, those statements are implicated in this analysis simply to the extent they go to the voluntariness of Defendant's later *Mirandized* statements to Sergeant Hawks.

Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600 (2004)—argues that earlier un-*Mirandized* questioning by Officer Lauver and Sergeant Hawks[8] rendered his subsequent *Mirandized* statements involuntary and, therefore, those statements must be suppressed. Doc. 22 at 3-4.

The Supreme Court held in *Seibert* that, where the defendant has already made one un-*Mirandized* statement and then makes a subsequent *Mirandized* statement, the threshold issue is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." 542 U.S. at 611-12. "[U]nless the warnings could place a suspect who has just been interrogated in a position to make . . . an informed choice" about continuing to talk to law enforcement, "there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id.* at 612. Facts bearing on whether *Miranda* warnings delivered "midstream" are sufficiently effective include: (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and second interrogations, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615.

Here, considering the relevant facts, the Court finds that Sergeant Hawks's *Mirandized* interview of Defendant was distinct from the earlier, un-*Mirandized* conversation with Officer Lauver, and, therefore, Officer Lauver's questioning did not render Defendant's later statements involuntary. Indeed, the circumstances presented in this case are factually distinct from those in

---

8   Although Defendant's motion focuses on the effect of the earlier questioning by Officer Lauver (Doc. 22 at 3-4), Defendant also argued at the hearing that the preliminary questioning by Sergeant Hawks—i.e., the questions asked <u>before</u> Sergeant Hawks administered the *Miranda* warnings—rendered Defendant's subsequent *Mirandized* statements involuntary. The Court addresses both arguments here.

*Seibert*. Here, upon Defendant's arrival in the interview room at the TPD law enforcement center, Sergeant Hawks began by introducing himself, telling Defendant who he worked for, and explaining what he understood to be the circumstances that brought Defendant in. Defendant was not handcuffed and only Sergeant Hawks and Defendant were present. As the government points out in its briefing (Doc. 24 at 11), there was no "question then mid-interview *Mirandize* then ask the same questions again" tactic like that utilized in *Seibert*. The interview with Sergeant Hawks took place in an entirely different location than Defendant's initial conversation with Officer Lauver, a significant amount of time (approximately an hour) had passed between the two interactions, and a different officer—from a different law enforcement agency—was questioning Defendant. Sergeant Hawks was not even aware at the time of his interview with Defendant that Defendant had been previously questioned by Officer Lauver.

In his motion, Defendant points to the fact that Sergeant Hawks's questioning, like the questioning by Officer Lauver, also included an inquiry regarding his use and possession of illegal substances. Doc. 22 at 4. But the context in which Sergeant Hawks made that inquiry was entirely different—it was asked in an attempt to gauge whether Defendant would be able to understand his questions. The focus of Sergeant Hawks's questioning was the firearm that was found in Defendant's vehicle (and which provides the basis for the charges in this case). Officer Lauver's questioning, in contrast, did not include any inquiries regarding the firearm.

Finally, the Court addresses the effect of Defendant's preliminary conversation with Sergeant Hawks (and cumulatively with Officer Lauver's conversation) on his later *Mirandized* statements. Again, this factual scenario is distinct from the situation in *Siebert*. Almost immediately after the interview began—just after Sergeant Hawks identified himself and explained why he was involved and what he had been told—Defendant made clear to Sergeant Hawks that

he wanted to talk, asking if there was anything he could do to help himself in the situation. In response, Sergeant Hawks did not question Defendant, but rather tried to respond to Defendant's inquiries, explaining that it was possible but that he could not promise anything. It was only after Sergeant Hawks advised Defendant of his *Miranda* rights and obtained Defendant's waiver of those rights that Defendant made the incriminating statements that he seeks to suppress. There is no evidence to suggest that those statements were coerced or otherwise involuntary. Again, Defendant repeatedly expressed a desire to talk to law enforcement if it would help his situation. And there is no evidence that Sergeant Hawks attempted to trick Defendant or suggested that Defendant was unable to make an informed choice.

For these reasons, the Court concludes that Defendant's *Mirandized* statements to Sergeant Hawks were voluntary and, thus, denies Defendant's motion to suppress those statements.

### III. CONCLUSION

THE COURT THEREFORE ORDERS that Defendant's Motion to Suppress Evidence (Doc. 21) is DENIED.

THE COURT FURTHER ORDERS that Defendant's Motion to Suppress Statements (Doc. 22) is DENIED.

IT IS SO ORDERED.

Dated: March 6, 2020    /s/ *Holly L. Teeter*
                                          HOLLY L. TEETER
                                          UNITED STATES DISTRICT JUDGE